PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee,*

v.

DAMIAN ANTONIO MURPHY,

　　　　　*Defendant-Appellant.*

No. 07-4607

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(1:06-cr-00062-gmw)

Argued: October 27, 2008

Decided: January 15, 2009

Before KING, Circuit Judge, HAMILTON, Senior Circuit
Judge, and Martin K. REIDINGER, United States District
Judge for the Western District of North Carolina, sitting by
designation.

───────────────

Affirmed by published opinion. Judge Reidinger wrote the
opinion, in which Judge King and Senior Judge Hamilton
joined.

───────────────

## COUNSEL

**ARGUED:** Richard Croutharmel, Raleigh, North Carolina,
for Appellant. Jennifer R. Bockhorst, OFFICE OF THE

UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Roanoke, Virginia, for Appellee.

## OPINION

REIDINGER, District Judge:

Damian Antonio Murphy appeals his conviction for conspiracy to possess with intent to distribute cocaine and hydromorphone, in violation of 21 U.S.C.A. §§ 846 and 841(b)(1)(C) (2000 & Supp. 2008), and for possession of counterfeit currency, in violation of 18 U.S.C.A. § 472 (Supp. 2008). On appeal, Murphy contends that the district court erred in denying his motion to suppress evidence of a cell phone, $14,790 in U.S. currency, and counterfeit money seized at the time of his arrest. We affirm.

I.

In the early morning hours of June 6, 2006, Virginia State Trooper Danny Pruett was operating stationary radar along Interstate 81 in Wythe County, Virginia, when he observed a vehicle traveling northbound at a high rate of speed. Radar confirmed that the vehicle was traveling 95 miles per hour. After stopping the vehicle, Trooper Pruett asked the driver for her license and registration. The driver, who was later identified as Marsha Massengill, advised him that she had left her operator's license at home. Massengill told Trooper Pruett that her name was Debbie Arlene Sanchez, and she provided a date of birth. Trooper Pruett observed that Massengill appeared to be nervous and hesitant. The front seat passenger, who was later identified as Damian Murphy, also claimed to have left his license at home. He told Trooper Pruett that his name was Corey Antonio Murphy and provided a date of birth. The back seat passenger, later identified as James

McCord, provided to Trooper Pruett an unusually thick Alabama license bearing the name Clarence Todd Drain. The occupants could not produce a registration for the vehicle, but they did produce a rental agreement for the vehicle in the name of Sabrina Callaway.

Trooper Pruett conducted a check through the National Crime Information Center (NCIC) on the names and dates of birth provided by the vehicle's occupants. The NCIC check revealed that there were no licenses or state identification cards issued to any persons by those names. The check also revealed that the license number appearing on the license of "Clarence Todd Drain" was a legitimate number, but that it had been issued to a female.

Having determined that no one in the vehicle had a valid driver's license, Trooper Pruett prepared to have the vehicle towed. He also requested additional officer assistance to help determine the identity of the vehicle's occupants and to assist him in conducting an inventory of the vehicle's contents, as required by Virginia State Police policy.

In speaking with Trooper Pruett, Massengill initially referred to the front seat passenger as "Corey" but later told Trooper Pruett that his name was "Damian." She referred to McCord as "James" and "Jay." She also told Trooper Pruett that she and Murphy were traveling to New York City to see Murphy's sick grandmother, and that McCord was just getting a ride to New York.

Murphy spoke with a second officer on the scene, Trooper Chapman. Murphy first identified himself to Trooper Chapman as "Corey Antonio Murphy" but later stated that his name was "Corey Demetrius Murphy." He provided Trooper Chapman with the names of individuals with whom he claimed to work at a company called Colgate Steel who allegedly could verify his identity. Murphy also gave Trooper

Chapman his cell phone and showed him how to use it in order to locate the number for his employer.

After conducting the NCIC check, Trooper Pruett arrested McCord for providing a fictitious driver's license. When told that the license number that he had provided belonged to a woman, McCord admitted that the license was fictitious, and he provided a second false name, James Anthony McCoy. McCord claimed ownership of a green duffle bag in the backseat of the vehicle. A search of this duffle bag incident to McCord's arrest revealed a fragment of a glass smoking pipe containing burnt residue, a dagger-type weapon, four additional fake licenses, and a plastic baggie with an off-white powdery substance consistent with the appearance of cocaine.[1]

Trooper Pruett arrested Massengill for reckless driving. Trooper Pruett searched her purse incident to her arrest and found a Jefferson County, Alabama inmate photo identification card with her picture and a Social Security card, both bearing the name "Marsha Arlene Massengill." Massengill admitted that it was her true name, and she explained that she had lied about her identity because she was wanted in Alabama for forgery. Trooper Pruett confirmed this warrant through NCIC.

Because Murphy had provided multiple names and his true identity could not be verified, he was arrested for obstruction of justice.

The officers began an inventory search of the vehicle at the scene. Inside the trunk, they discovered a duffle bag containing make-up and women's clothing, and a laptop bag containing $14,790 in U.S. currency, which was packaged in stacks containing equal amounts of money, folded and arranged to

---

[1]A subsequent lab analysis revealed this substance to be baking soda. McCord testified at trial that he used this baking soda both to brush his teeth and to mix with cocaine in order to make crack.

offset one another, and then banded with rubber bands. Based on his training, Trooper Pruett knew this type of packaging was often used by drug dealers in the purchase of large quantities of narcotics. Murphy claimed ownership of the money and stated that he had withdrawn the money from a bank account, but he admitted that he had no documentation of this withdrawal. Murphy claimed to have earned the money by operating a lawn care business. Murphy further stated that he was planning to use the money to purchase shoes and clothing in New York for stores that he planned to operate in Alabama. A canine unit trained to detect the smell of narcotics was brought first to the scene of the traffic stop and then to the Sheriff's Department. While the drug dog did not alert to the vehicle on the scene, it did alert to the currency at the station in a manner indicating that it was positive for drug residue.

Prior to the vehicle being towed, the officers removed all items from the vehicle and transported them to the Sheriff's Department for completion of the inventory. All three of the vehicle's occupants were transported to the Wythe County Sheriff's Department for booking. When Murphy was told that he was going to be fingerprinted, he told Trooper Pruett his true name and date of birth. Murphy told Trooper Pruett that he had lied about his identity because he was on parole for several drug violations and had left the state of Alabama without his parole officer's permission. His identity was verified through NCIC and by photo identification faxed to the Sheriff's Office from an Alabama jail.

While at the Sheriff's Department, McCord made several requests to go to the restroom. He was searched prior to being allowed to go to the restroom, and a bag containing crack cocaine and powder cocaine was recovered from his underwear. At that point, McCord's duffle bag was more thoroughly searched, and a business card was discovered, which revealed McCord's true name. McCord's identity was verified by photo identification faxed from Alabama authorities, who

advised that there was an outstanding arrest warrant for McCord for distribution of narcotics.

At the Sheriff's Department, the officers continued to inventory the items removed from the vehicle. One of the items that had been removed from the glove compartment of the vehicle was a plastic bag containing a yellow Timberland t-shirt. When the officers searched the bag at the Sheriff's Department, they discovered that inside the shirt were 26 uncut sheets of counterfeit $100 bills. Murphy denied any knowledge of the counterfeit money, although he admitted that he had placed the plastic bag in the glove compartment at McCord's request.

During the inventory of the items seized from the vehicle, a supervisor advised Trooper Pruett that some of the cell phones contained possible incriminating information, and he instructed Trooper Pruett to log them in as evidence.

The evidence in this case was transferred to Virginia State Police headquarters and subsequently turned over to the custody of a Drug Enforcement Administration (DEA) Task Force Officer, who transported it to the DEA office for processing. The evidence, including Murphy's cell phone, was examined by DEA Special Agent Brian Snedecker on June 29, 2006. Snedeker identified several text messages sent from an individual named Brian Sheppard. In a telephone interview with Snedeker that same day, Sheppard stated that Murphy was his drug supplier.

## II.

In reviewing the denial of a motion to suppress, we must construe the facts in the light most favorable to the government. *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir.), *cert. denied*, 128 S. Ct. 154, 169 L. Ed. 2d 106 (2007). We review the district court's factual findings for clear error and its legal conclusions *de novo*. *Id.*

III.

Murphy first argues that the district court erred in refusing to suppress evidence of his cell phone and its contents. Specifically, Murphy contends that the district court erred in concluding that the cell phone was seized during a search incident to arrest because there was no evidence presented to indicate that the cell phone was located on his person at the time of his arrest. He further argues that the officers were not authorized to examine the contents of the phone without first obtaining a warrant. We will address each of these arguments in turn.

A.

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const., amend. IV. Warrantless searches "are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *United States v. Bush*, 404 F.3d 263, 275 (4th Cir. 2005) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)). One of the well-recognized exceptions to the warrant requirement is a search incident to a lawful arrest. *See United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006). Pursuant to this exception, law enforcement officers following a lawful arrest may search "the arrestee's person and the area 'within his immediate control.'" *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969)).

At the suppression hearing, Murphy's counsel initially argued that the officers lacked probable cause to arrest Murphy for the offense of obstruction of justice and that the evidence seized from Murphy's person following his arrest therefore should be suppressed. When the magistrate judge noted that there had been no testimony to indicate that any items had been seized from Murphy's person, Murphy's counsel stated that it was her understanding from her client

that the cell phone had been retrieved from his person, and she asked permission to recall the arresting officers to verify that fact. Trooper Chapman was recalled to the stand and testified that he recalled Murphy having a cell phone in his possession, as Murphy had shown him some numbers in the cell phone. Trooper Chapman further recalled that, at one point, Murphy even gave him the phone and instructed him on how to use it to retrieve phone numbers and other stored information.

On appeal, Murphy does not challenge the district court's finding of probable cause for his arrest. Rather, he limits his argument to challenging whether there was evidentiary support for the district court's finding that the cell phone was seized from his person during a search incident to that arrest. This argument, however, is without merit. The testimony of Trooper Chapman, which was elicited by Murphy's own counsel, clearly provided a reasonable basis for the district court to infer that Murphy had the cell phone in his possession at the time of his arrest. As such, the district court's factual finding that the cell phone was found on Murphy's person was not clearly erroneous. Accordingly, we conclude that the district court did not err in determining that the cell phone was seized lawfully during a search incident to arrest.[2]

### B.

Next, Murphy argues that the warrantless search of the contents of the cell phone was not lawful for two reasons. First, he argues that it was improper because there was no evidence of the volatile nature of the cell phone's information. Second, he argues that the search of the cell phone's contents was

---

[2]In any event, regardless of whether the cell phone was located on Murphy's person or within the vehicle, the cell phone was also subject to seizure as a result of the subsequent inventory search. *See United States v. Banks*, 482 F.3d 733, 739 (4th Cir. 2007). The propriety of this inventory search is discussed in greater detail later in Part IV of this opinion.

unlawful because it was not contemporaneous with his arrest. Because Murphy did not raise these issues below, we review his claims for plain error. *See United States v. Olano*, 507 U.S. 725, 731-32, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993).

Citing the "manifest need . . . to preserve evidence," this Court has held on at least two prior occasions, albeit in unpublished opinions, that officers may retrieve text messages and other information from cell phones and pagers seized incident to an arrest. *See United States v. Young*, 278 Fed. Appx. 242, 245-46 (4th Cir. May 15, 2008) (per curiam) (holding that officers may retrieve text messages from cell phone during search incident to arrest), *cert. denied*, 129 S. Ct. 514 (2008); *United States v. Hunter*, No. 96-4259, 1998 WL 887289, at *3 (4th Cir. Oct. 29, 1998) (holding that officers may retrieve telephone numbers from pager during search incident to arrest). Similarly, the Fifth Circuit and Seventh Circuit have held that the need for the preservation of evidence justifies the retrieval of call records and text messages from a cell phone or pager without a warrant during a search incident to arrest. *See United States v. Finley*, 477 F.3d 250, 260 (5th Cir.), *cert. denied*, 127 S. Ct. 2065, 167 L. Ed. 2d 790 (2007); *see also United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir. 1996).

Murphy argues that whether a cell phone may be searched without a warrant can be determined only upon the officers ascertaining the cell phone's storage capacity. In so arguing, he concedes that a device with a small storage capacity may be searched without a warrant due to the volatile nature of the information stored, but that a search of a cell phone with a larger storage capacity would implicate a heightened expectation of privacy and thus would require a warrant to be issued before a search could be conducted.

Murphy's argument is problematic for several reasons. First, Murphy has not provided the Court with any standard by which to determine what would constitute a "large" storage

capacity as opposed to a "small" storage capacity, as he does not quantify these terms in any meaningful way. Second, Murphy has introduced no evidence that his cell phone had the requisite "large" storage capacity which he contends is subject to a heightened expectation of privacy. Third, even assuming that his cell phone does have a "large" storage capacity, his argument still fails because it is premised on the unwarranted assumption that information stored on a cell phone with a "large" storage capacity would be any less volatile than the information stored on a cell phone with a "small" storage capacity.

Finally, Murphy's argument must be rejected because to require police officers to ascertain the storage capacity of a cell phone before conducting a search would simply be an unworkable and unreasonable rule. It is unlikely that police officers would have any way of knowing whether the text messages and other information stored on a cell phone will be preserved or be automatically deleted simply by looking at the cell phone. *See Young*, 278 Fed. Appx. at 245. Rather, it is very likely that in the time it takes for officers to ascertain a cell phone's particular storage capacity, the information stored therein could be permanently lost. For these reasons, we reject Murphy's argument that the government must ascertain a cell phone's storage capacity in order to justify a warrantless search of that phone incident to arrest.

Further, Murphy's argument that the search of the cell phone's contents was unlawful because it was not performed contemporaneously with his arrest is also without merit. The evidence establishes that the initial search of the cell phone occurred in Murphy's presence and at his direction, after he indicated to Trooper Chapman that the phone contained phone numbers for people who could corroborate his identity. Another search of the cell phone occurred at the Sheriff's Department during the course of the inventory search, when a supervising officer noted that the cell phone contained potentially incriminating information and directed Trooper

Pruett to retain the cell phone as evidence in the case. Of course, once the cell phone was held for evidence, other officers and investigators were entitled to conduct a further review of its contents, as Agent Snedeker did, without seeking a warrant. *See United States v. Edwards*, 415 U.S. 800, 803-04, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974). For these reasons, we conclude that the district court committed no error, plain or otherwise, in refusing to suppress the contents of Murphy's cell phone.

IV.

Murphy next argues that the district court erred in concluding that the $14,790 in U.S. currency and the counterfeit money found in the vehicle were properly seized as a result of a lawful inventory search of the vehicle. Specifically, Murphy argues that the officers' failure to complete the search at the scene of the traffic stop gives rise to an inference of bad faith, in that it demonstrates that the officers were merely rummaging for incriminating evidence when they continued searching the vehicle's contents at the Sheriff's Department. Because Murphy did not challenge the legality of the inventory search below, we review his claim for plain error. *See Olano*, 507 U.S. at 731-32, 113 S. Ct. 1770.

"A proper inventory search is merely an incidental administrative step following arrest and preceding incarceration, conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." *Banks*, 482 F.3d at 739 (internal citations and quotation marks omitted). An inventory search, however, must "be conducted according to standardized criteria," such as a uniform police department policy. *Colorado v. Bertine*, 479 U.S. 367, 374 n.6, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987). For an inventory search to be lawful, the vehicle searched must be in the lawful custody of the police. "If the vehicle is in lawful custody, the police may inventory the vehicle, if such inventories are rou-

tine and conducted pursuant to the standard police procedures, so long as the purpose of the inventory is to secure the car or its contents and not to gather incriminating evidence against the owner." *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986).

Upon reviewing the evidence, we conclude that the inventory search conducted in this case was valid. As the testimony of Trooper Pruett established, the towing of the vehicle required a full search of the vehicle and its contents pursuant to the inventory search policy of the Virginia State Police. While Murphy argues that the inventory search was nothing more than a pretext for gathering evidence against him, he points to no evidence in support of this claim, aside from the fact that the officers decided to complete the inventory search at the Sheriff's Department after the vehicle was towed. The officers' decision to complete the inventory search of the vehicle's contents at a different location, however, was entirely reasonable under the circumstances. The stop occurred in the early morning hours along a busy interstate highway. The officers recovered several containers from the vehicle which needed to be searched. The mere fact that the officers opened some of these containers at the scene of the stop and removed the rest of the unopened containers from the vehicle in order to complete their inventory search at the Sheriff's Department in no way renders their inventory search unlawful. The Supreme Court has held that inventory searches may be conducted at locales other than the initial scene of arrest. *See Illinois v. Lafayette*, 462 U.S. 640, 645-46, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983) (upholding inventory search of person and belongings conducted at police station); *see also United States v. Colclough*, 549 F.2d 937, 940 (4th Cir. 1977) (upholding inventory search at impound lot). Thus, the officers' decision to complete the inventory search at the Sheriff's Department did not render the search invalid.

For these reasons, we conclude that the district court did not commit error, plain or otherwise, in denying Murphy's

motion to suppress the counterfeit money and U.S. currency found in the vehicle.

## V.

Accordingly, for the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*