**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

ANTONIO BERNARD GRIFFIN,

      *Defendant-Appellant.*

No. 08-4045

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert J. Conrad, Jr., Chief District Judge.
(3:06-cr-00103-RJC-DCK-1)

Argued: September 22, 2009

Decided: December 17, 2009

Before TRAXLER, Chief Judge, and GREGORY and
SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Shedd wrote the majority opinion, in which Chief Judge Traxler joined. Judge Gregory wrote a dissenting opinion.

---

## COUNSEL

**ARGUED**: Matthew Segal, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant. Mark Andrew Jones, OFFICE OF

THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Kevin Tate, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Gretchen C. F. Shappert, United States Attorney, Charlotte, North Carolina, for Appellee.

---

**OPINION**

SHEDD, Circuit Judge:

Antonio Bernard Griffin appeals his conviction and sentence for being a felon in possession of a firearm. *See* 18 U.S.C. § 922(g). Griffin contends that the district court erred in denying his motion to suppress the firearm by holding that (1) the police officers who arrested him had reasonable suspicion to perform an investigatory stop of his vehicle under *Terry v. Ohio*, 392 U.S. 1 (1968), and (2) the officers were justified in conducting a protective search of his vehicle under *Michigan v. Long*, 463 U.S. 1032 (1983). For the following reasons, we reject these contentions and affirm.

I.

In reviewing the denial of a suppression motion, we construe the facts in the light most favorable to the government. *United States v. Murphy*, 552 F.3d 405, 409 (4th Cir. 2009). The evidence presented during the suppression hearing establishes that the Value-Lodge Motel in Charlotte, North Carolina, was well known to officers of the Charlotte-Mecklenburg Police Department as a location for violent crime and drug trafficking. On the evening of September 28, 2005, someone called 911 from a second floor room of the Value-Lodge reporting a man in possession of a gun. The 911 call center relayed this information, including the caller's room number, to Officer Crystal Lee Clifton, and she

responded to the call. Upon arriving at the Value-Lodge, Officer Clifton proceeded to the second floor room from which the call was made and talked with one of the room's occupants (the "informant") who was aware that the call had been placed. Shortly thereafter, Officer Brian Carey, who was also responding to the 911 call, arrived at the Value-Lodge.[1] While Officer Clifton was talking to the informant, a white Cadillac drove past in the parking lot below, and the informant immediately pointed to the vehicle and identified the driver as the man with the gun. Officer Carey returned to his patrol car and pursued the Cadillac which was exiting the Value-Lodge parking lot. He proceeded approximately 50 feet and then entered a nearby parking lot where the Cadillac was turning around. Officer Clifton remained with the informant.

Officer Carey then initiated a traffic stop of the vehicle and its sole occupant, Antonio Griffin. When Griffin exited the vehicle, he "started looking around" and "kept turning around like he was going to take off running." J.A. 27, 43. Officer

---

[1]The dissent's assertion that the informant was "gender-less" is factually incorrect. Instead, Officer Carey testified that the informant was a "gentleman." J.A. 60, 25. Further, to the extent that the officers' ability to recall these details is pertinent, the district court found the officers' testimony credible. We defer to the district court's credibility findings, as "it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (citing *United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995)). *See also United States v. Clark*, 538 F.3d 803, 812-13 (7th Cir. 2008) (upholding the district court's reliance on the testimony of a witness despite the fact that he was an admitted perjurer and drug user who failed to recall specific details about his deals with the defendant). There is no constitutional requirement that police record the identifying information of an informant, particularly in such rapidly evolving circumstances as occurred here. As we have observed, "We cannot afford to read the Fourth Amendment to require officers to wait . . . perhaps until innocent bystanders are physically harmed, before taking reasonable, preventive measures." *United States v. Perkins*, 363 F.3d 317, 328 (4th Cir. 2004). *See also United States v. Sanchez*, 519 F.3d 1208, 1211 (10th Cir. 2008) ("We do not fault the officer's choice to forgo extensive credibility checking in order to quickly respond.").

Carey conducted a *Terry* frisk of Griffin and, out of concern for his safety, handcuffed Griffin and placed him in the back-seat of the patrol car. While Officer Carey was speaking with Griffin, Officer Clifton and another officer arrived on the scene. At this time, an individual approached the officers claiming to know Griffin, and onlookers from the motel gathered at the scene. Officer Clifton thereafter performed a search of the passenger compartment of Griffin's car, finding a pistol on the driver's side floorboard. Officer Clifton seized the weapon, and Officer Carey placed Griffin under arrest for carrying a concealed weapon.

Griffin was subsequently indicted for possessing the pistol after having been previously convicted of a felony, in violation of section 922(g). Griffin moved to suppress the pistol and other evidence not relevant to his appeal. Following a suppression hearing during which Officers Carey and Clifton testified, the district court ruled that the officers did not violate Griffin's Fourth Amendment rights. Relying on our decisions in *United States v. Perkins* and *United States v. Christmas*, 222 F.3d 141 (4th Cir. 2000), the district court concluded that Officer Carey had reasonable suspicion to conduct a traffic stop based upon the face-to-face encounter between Officer Clifton and the informant. The district court also concluded that the protective search of Griffin's vehicle was justified. Thereafter, Griffin conditionally pled guilty, retaining the right to appeal the district court's order denying the suppression motion. After accepting this plea, the district court sentenced Griffin to 40 months of imprisonment.

Griffin filed a timely notice of appeal, and we possess jurisdiction under 28 U.S.C. § 1291. On appeal, Griffin argues that both the stop of his vehicle and the protective search of his vehicle were unconstitutional.

## II.

We review the district court's factual findings for clear error and its legal conclusions *de novo*. *Murphy*, 552 F.3d at

409. The district court's ultimate conclusion that the traffic stop and protective search are constitutional is a legal conclusion which we review *de novo*. *United States v. Reaves*, 512 F.3d 123, 126 (4th Cir. 2008).

A.

A law enforcement officer may initiate a brief investigatory stop if the officer has reasonable suspicion to believe that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In determining whether an officer had reasonable suspicion, we view the totality of the circumstances to determine whether the officer had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). Although the reasonable suspicion standard "defies precise definition," *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008), it is less demanding than probable cause, *Alabama v. White*, 496 U.S. 325, 330 (1990), and falls "considerably short of satisfying a preponderance of the evidence standard," *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

In cases such as this, where the officer met with the informant in a face-to-face encounter,[2] we have considered numerous factors to determine whether the officer had reasonable suspicion to effect a *Terry* stop. For example, we have exam-

---

[2]*Florida v. J.L.*, 529 U.S. 266, 270 (2000) (holding that an anonymous tip in a 911 call must bear additional "indicia of reliability" to create reasonable suspicion), on which Griffin relies, is inapplicable here because face-to-face tips are "altogether different from anonymous tips." *Christmas*, 222 F.3d at 143. *See also United States v. DeQuasie*, 373 F.3d 509, 523 (2004) (distinguishing anonymous tips from face-to-face encounters); *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004) ("A face-to-face anonymous tip is presumed to be inherently more reliable than an anonymous telephone tip . . . ."). Even assuming that the original 911 call can be deemed anonymous, Officer Clifton followed up on the call and met face-to-face with the informant at the motel room from which the call was placed. During this meeting, the informant identified the driver of a white Cadillac as the man with a gun, initiating the pursuit of the vehicle.

ined whether the officer had the opportunity to observe the informant's credibility and demeanor and whether the officer could later hold the informant accountable for making false accusations. *See, e.g.*, *Christmas*, 222 F.3d at 144.[3] We have also considered whether the informant reported to the police in public, exposing himself to retaliation from the suspect and increasing the informant's reliability. *See, e.g.*, *id.* We also have looked to the informant's proximity to the reported activity as a factor in determining his reliability. *See, e.g.*, *id.*; *Perkins*, 363 F.3d at 322. Additionally, we have placed importance on the officer's personal experience in investigating similar activity at the reported location in justifying the stop. *See, e.g., Perkins*, 363 F.3d at 322. Finally, the Supreme Court has stated that less scrutiny is required as to an informant's basis of knowledge where a citizen whose honesty has not been questioned reports criminal activity "which if fabricated would subject him to criminal liability." *Illinois v. Gates*, 462 U.S. 213, 233-34 (1983).

Here, Officer Clifton spoke with the informant and remained with the informant when Officer Carey left in pursuit of Griffin, giving her further opportunity to observe the informant's credibility and demeanor. Having observed the informant's physical appearance and location, the officers could have returned to the Value-Lodge and tracked him down to hold him accountable if his accusations had proven false. The informant met with Officer Clifton in public, thereby exposing himself to retaliation from Griffin. In addition, the informant was in close proximity to Griffin's vehicle when he spoke with Officer Clifton. Further, Officer Carey was familiar with the Value-Lodge and had taken numerous calls reporting dangerous weapons from that motel, thereby contributing to his reasonable suspicion for the stop. Finally,

---

[3]In *Christmas*, we found reasonable suspicion on facts similar to those here. In that case, the officers relied on a face-to-face tip from an unidentified neighborhood resident who reported men with guns and drugs at an address two doors down from her residence. *Id.* at 143-45.

there are no facts in the record that call into question the informant's honesty or motivation. In short, we agree with the district court that the circumstances of the face-to-face encounter between the informant and Officer Clifton provided sufficient reasonable suspicion to justify the *Terry* stop of Griffin's vehicle.[4]

B.

Griffin also challenges the actual search of his vehicle which resulted in the seizure of the pistol. When officers conduct a *Terry* stop of an automobile,

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Long*, 463 U.S. at 1049 (internal quotation marks omitted). In order to conduct a lawful protective search of a stopped vehicle under *Long*, an officer must possess a reasonable belief of both (1) the suspect's dangerousness and (2) the possibility that the suspect might gain immediate control of any weapons inside the vehicle. *United States v. Holmes*, 376 F.3d 270, 276 (4th Cir. 2004).

---

[4]A contrary holding would prevent a police officer in a high-crime area from stopping a person who, according to an informant via a face-to-face conversation with police, has a gun. As we explained in *Christmas*, "[a] community might quickly succumb to a sense of helplessness if police were constitutionally prevented from responding to the face-to-face pleas of neighborhood residents for assistance." 222 F.3d at 145.

The Supreme Court has observed that, where an officer concludes that a suspect is armed, the suspect "pose[s] a serious and present danger to the safety of the officer." *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (per curiam); *see also J.L.*, 529 U.S. at 272 (recognizing "the serious threat that armed criminals pose to public safety"). Officers may also consider a suspect's evasive behavior in analyzing the existence of reasonable suspicion to believe that an individual is armed and dangerous. *United States v. Mayo*, 361 F.3d 802, 807-08 (4th Cir. 2004). Furthermore, officers may consider "the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). As to the first prong of the *Holmes* test, the circumstances of the stop justified a reasonable belief in Griffin's dangerousness. First, once the officers arrived on the scene, an informant met face-to-face with Officer Clifton and pointed out the driver of Griffin's vehicle as the man with the gun. Second, at the time of the protective search of the vehicle, Officer Carey was responding to a firearm call in a high-crime neighborhood where he had personally taken numerous calls reporting dangerous weapons.[5] Third, Griffin's evasive behavior when Officer Carey stopped his vehicle heightened the officers' concern that Griffin was armed and dangerous.[6]

---

[5]The dissent's reliance on *United States v. Neely*, 564 F.3d 346 (4th Cir. 2009), is misplaced. In that case, the officer stopped Neely for a minor traffic infraction and had no suspicion that Neely possessed a firearm or was otherwise dangerous at all. *Id.* at 352. Even so, we described the issue as "close." *Id.* Here, of course, the officers stopped Griffin because they suspected that he possessed a firearm in a high crime area.

[6]In viewing the search for reasonableness, the presence of onlookers mingling around this stop in a high-crime area, including one individual purporting to know Griffin who approached the scene, also contributed to danger posed to the officers, even though this does not add to the danger posed by Griffin acting alone. *See Mora v. City of Gaithersburg*, 519 F.3d 216, 222 (4th Cir. 2008) ("We are to approach the Fourth Amendment . . . with at least some measure of pragmatism.").

These factors, taken together, gave the officers reasonable suspicion to believe that Griffin could be dangerous.[7]

The second prong, concerning the possibility that the suspect might gain immediate control of any weapons inside the vehicle, is also satisfied. Although Griffin was restrained in the backseat of the police vehicle at the time of the search, he was being detained at that time solely pursuant to the *Terry* stop. If Griffin had been released after the brief detention, as he presumably would have been, he would have regained access to his vehicle and any weapon inside. *See United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) ("[A] protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested.").[8] Therefore, given the circumstances confronting the officers, the brief protective search of Griffin's vehicle was proper.

---

[7]We note that to the extent that the district court relied on the discovery of the pistol as a justification for the search, this was error. *See J.L.*, 529 U.S. at 271 ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."). Such error, however, was harmless in this case because the court's other findings were sufficient to justify the search.

[8]Because Griffin was not yet arrested at the time of the search, *Arizona v. Gant*, 129 S.Ct. 1710 (2009), is inapposite. That case held that police may search a vehicle incident to a recent occupant's arrest as authorized by *Chimel v. California*, 395 U.S. 752 (1969) "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant*, 129 S.Ct. at 1719. This reasoning does not extend to protective searches under *Long* because in a *Terry* stop where the suspect has not been arrested, "the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed." *Id.* at 1724 (Scalia, J., concurring).

III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

The majority opinion brings the Fourth Amendment two steps closer to a death by a thousand cuts. Today's decision leaves us teetering on the brink of a per se rule that any face-to-face dialogue between the police and an informant, however scant, is sufficient to create the reasonable suspicion necessary for a *Terry* stop in a "man with a gun" case. It then gives expansive meaning to *Michigan v. Long*'s limited authorization for conducting vehicle searches in connection with a *Terry* stop. Because I believe that today's decision relies on an overbroad reading of this Court's precedent and contravenes the spirit, if not the letter, of *Florida v. J.L.*, 529 U.S. 266, 270 (2000), I respectfully dissent.

I.

When officers reported to the Value Lodge Motel on September 28, 2005, they knew only that an anonymous tipster had called 911 from that location to report "a man with a gun." (J.A. 55.) Officer Clifton testified at the suppression hearing that she was the first to arrive on the scene and that she proceeded to the second-floor room number noted by the police dispatchers and spoke with someone in that room ("the informant"). She did not inquire whether the informant was the person who had placed the anonymous 911 call, and she could not even recall whether the informant was a man or a woman. (J.A. 60.)

The testimony of Officer Carey, the next officer to arrive on the scene, does little more to clarify Officer Clifton's

admittedly vague recollections of the informant. At one point in his testimony, Officer Carey did refer to the informant as "the gentleman with whom we were speaking." (J.A. 25.) However, the reliability of this gender identification is highly questionable given that Officer Carey later indicated that he could not recall whether he ever spoke with the informant and that he had "no knowledge about this person [the informant]." (J.A. 38.) In fact, Officer Clifton testified that Officer Carey remained on the ground floor level at all times that she was upstairs speaking with the informant.[1]

At some point, the nameless, gender-less informant pointed to a vehicle in the motel parking lot and said "That's the car; that's him inside." (J.A. 61.) The informant provided no additional identifying information about the man in the car, and the officers had no independent information about him. Nonetheless, the officers believed this sufficed to create a reasonable suspicion to conduct a *Terry* stop and patdown of Mr. Griffin. The district court and now the panel majority have agreed.

The majority reasons that because Officer Clifton met face to face with the informant, the information gleaned from that encounter was not an anonymous tip that would require additional "indicia of reliability" in order to provide the basis for a *Terry* stop, *J.L.*, 529 U.S. at 270. Face-to-face encounters are undeniably more reliable as a general matter than purely anonymous tips. *See United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000). But neither this Court nor the Supreme Court has ever created a rule that an encounter between a police officer and an informant is a per se reliable basis for creating reasonable suspicion simply because that encounter occurred face-to-face. This case illustrates precisely why such a rule would be improper.

---

[1]The district court also acknowledged these inconsistencies in Officer Carey's testimony. (*See* J.A. 71-72.)

The Supreme Court's concern with the anonymous tip at issue in *J.L.* was that "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." 529 U.S. at 271. In *Christmas*, we were able to distinguish *J.L.* because, by obtaining their tip in a face-to-face encounter with the informant, the *Christmas* officers were able to assess the informant's credibility and were in a position to hold the informant accountable for any false statements she might have made. 222 F.3d at 144.

Here, the face-to-face encounter had none of the indicia of reliability that normally inhere in such circumstances. In fact, this encounter may as well have been a purely anonymous one. Neither Officer Clifton nor Officer Carey could provide any reliable identifying information about the informant—no name, no gender. Neither officer could say what the informant's basis for his or her knowledge was. While the informant may have been "in close proximity to Griffin's vehicle when he spoke with Officer Clifton" (Maj. Op. at 6), it does not appear that the informant ever stated that he or she personally saw the defendant with a gun. In short, this face-to-face encounter did not result in anything even close to the kind of assessment of "credibility and demeanor" that occurred in *Christmas*. 222 F.3d at 144.

The majority dismisses Griffin's arguments about the accountability of the informant because, in their view, the officers could always return to the motel room where the informant was originally found. (Maj. Op. at 6.) But the path to accountability that the majority sketches is clearly more tenuous than that in *Christmas*. Unlike in *Christmas* where the informant was an unnamed neighbor of the defendant, 222 F.3d at 143, the informant here was but a transient motel guest. While we know little about the personal circumstances of the informant —how long he or she had been at the motel or how long he or she planned to stay—he or she certainly

could pack up and leave a motel room much more easily than one could a home. Any suggestion that the informant could easily be held accountable is further undermined by the fact that the police had no idea what the informant looked like. *Cf. United States v. Valentine*, 232 F.3d 350, 355 (3d Cir. 2000) ("[T]he officers could assess the informant's credibility as he spoke, knew what the informant looked like, and had some opportunity to find the informant if the tip did not pan out.").

As a result, I find the majority's blithe comparisons of this case to *Christmas* and similar cases in other circuits alarming. This case does not fall in squarely with these other precedents; at best, it strains their outer boundaries. In *Christmas*, officers investigating a homicide were approached by a neighborhood resident, who gave her address and reported that drugs were being dealt at the home two doors down from her. 222 F.3d at 143. The police proceeded to that home and observed a group of people on the porch, one of whom—the defendant—was recognized as a gang member from another part of town. *Id.* at 143, 145. This independent recognition and awareness of the defendant provided sufficient indicia of the reliability of the informant's tip because the officers could reasonably surmise that Christmas' presence on the porch was odd and "created a potential for violence." *Id.* at 145. Here, the officers knew nothing about the informant except that he or she was found in the same motel room from which the 911 call was placed and they had no independent information about the defendant to support the informant's tip.

The officers in *United States v. Romain*, 393 F.3d 63 (1st Cir. 2004), similarly had much more than a tip from an unknown informant to justify their pat-down of the defendant. Officers responded to a 911 call in which a woman, who sounded as if she were in danger, told the emergency operator that there was a man with a gun at her location. *Id.* at 66. When they arrived, two women answered the door, and one nodded affirmatively when asked if there was someone in the apartment with a gun. *Id.* When officers entered, the defen-

dant emerged from a bedroom acting aggravated, flailing his arms and shouting, and moved threateningly towards one of the officers. *Id.* After seizing the defendant and placing him against the wall, one of the officers spoke with the woman who had indicated there was a gun in the apartment and asked if she had placed the 911 call. *Id.* at 66-67. She admitted to being the caller and told the officers that the gun was in the defendant's waistband. *Id.* Only then did officers conduct a pat-down. *Id.*; *cf. United States v. Heard*, 367 F.3d 1275 (11th Cir. 2004) (finding reasonable suspicion for stop and frisk after officer observed and helped to end public dispute between defendant and unknown informant who left before she could be questioned); *Valentine*, 232 F.3d at 352, 357 (finding reasonable suspicion for stop and frisk where officers first obtained detailed description from unknown informant with personal knowledge and then observed defendant acting evasively).

In each of these cases, officers had an opportunity to observe the credibility and demeanor of an informant in a face-to-face dialogue—and they actually took advantage of that opportunity. More importantly, in each of these cases, the officers made independent observations that corroborated the suspicions raised by the informants. This is a far cry from the facts before us in this appeal. I take no issue with the majority's well-supported point that face-to-face dialogues *generally* result in a very different species of tip than that offered by a purely anonymous informant. But, even if nine out of ten face-to-face encounters with an informant provide the necessary indicia of reliability to create a reasonable suspicion, this case is plainly the unreliable tenth. Officers Clifton and Carey had no independent information to corroborate the unidentified informant's incriminating statements against Griffin and they cannot plausibly be said to have assessed the informant's credibility and demeanor, such that the tip itself might suffice to provide a reasonable suspicion. Thus, though perhaps technically not an "anonymous tip" case, this case is much closer to *J.L.* in its facts than it is to either *Christmas* or *Romain*.

The majority's efforts to square this case with *Christmas* seem motivated, at least in part, by their concerns about the ramifications of "a contrary holding." (Maj. Op. at 7 n.4.) Undoubtedly, "man with a gun" tips put officers in an especially dangerous position that might "sometimes justify unusual precautions." *J.L.*, 529 U.S. at 272. Yet, the Supreme Court has already considered and rejected the idea that "an automatic firearm exception to our established reliability analysis" is warranted. *Id.*

The majority's opinion comes dangerously close to flouting this and creating a per se rule of reliability for face-to-face dialogues with informants in "man with a gun" cases. With this case as precedent, an officer provided with a "man with a gun" tip in a high-crime area by an unknown, unaccountable informant may now, without any other indicia of reliability, conduct a *Terry* stop. This clearly undermines at least the spirit of *J.L.*, and it relies on an overbroad reading of our precedent in *Christmas*. In fact, this decision "enable[s] any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by . . . falsely reporting the target's unlawful carriage of a gun." *J.L.*, 529 U.S. at 272.

## II.

Even assuming the *Terry* stop and accompanying pat-down were proper, it is undisputed that they yielded no evidence of criminal conduct on the part of Mr. Griffin. Nonetheless, Officer Carey decided to handcuff Griffin and place him in the back of a patrol car. He then instructed Officer Clifton to search Griffin's vehicle. The majority finds this vehicle search to be proper under *Michigan v. Long*, 463 U.S. 1032 (1983).

*Long* imposes a two-part test for vehicle searches pursuant to a *Terry* stop: an officer must have a "reasonable belief" that (1) "the suspect is dangerous," and (2) "the suspect may gain

immediate control of weapons." *Id.* at 1049. On this first requirement, the majority points to three factors that it feels support the officer's search: first, the officers received a face-to-face tip that Griffin had a gun; next, the defendant was in a "high crime area;" and, finally, Griffin acted evasive during the pat-down. However, none of these suffice, alone or taken together, to create a reasonable belief that Griffin was dangerous.

Standing as a hallmark of our investigatory stop jurisprudence is the principle that such stops are only justified where officers have a "reasonable, *individualized* suspicion" of criminal activity before a frisk or protective search takes place. *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990) (emphasis added). So, while "the fact that [a] stop occurred in a 'high crime area' [is] among the relevant contextual considerations," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quoting *Adams v. Williams*, 407 U.S. 143, 144, 147-48 (1972)), it cannot be an endpoint for a *Terry* or *Long* analysis. Otherwise, we relegate those unfortunate enough to have to live in such "high crime areas" to second-class citizenship for purposes of the Fourth Amendment.

Whatever individualized suspicion of Griffin's dangerousness the officers could have had, it had to rest on the information provided by the informant and on Griffin's conduct during the *Terry* pat-down. At the risk of beating a dead horse, I must emphasize again the flimsiness of the informant's tip. The only information the informant gave to implicate Griffin was his or her statement, "That's the car; that's him inside." (J.A. 61.) The informant gave no indication about the basis of his or her knowledge, and the officers themselves had failed to confirm that the informant was the same person who placed the 911 call. The informant's statement might have been more of a "smoking gun" if, as in most face-to-face encounters, the officers had actually taken the opportunity to assess the informant's credibility and demeanor. Instead, the officers could tell the district court virtually nothing about the

source of their information—not even the person's gender. As for Griffin's so-called "evasive" behavior (Maj. Op. at 8), this occurred not prior to the *Terry* stop, but during the patdown, and it consisted simply of his "turning around" (J.A. 27), a reaction that seems a natural and instinctive response to being frisked by a police officer.[2]

Not one of the factors cited by the majority could by itself support a finding that *Griffin* was a danger of the kind needed to justify a protective search of his vehicle. In combination, these factors fare no better. The majority once again finds that the search rests comfortably within the boundaries of our precedent, specifically *United States v. Elston*, 479 F.3d 314 (4th Cir. 2007) and *United States v. Holmes*, 376 F.3d 270 (4th Cir. 2004). But, in fact, both cases are readily and significantly distinguishable. In *Holmes*, we found that officers could reasonably believe that the defendant was dangerous given their particularized suspicion that he was a gang member who had previously been involved in a number of armed, violent felonies. 376 F.3d at 277. In *Elston*, a *Long* search was upheld where a named informant provided a 911 operator with a detailed description of the defendant, who had left her home in his truck, highly intoxicated and with a loaded handgun and extra ammunition that he had threatened to "let[ ] . . . off in somebody." 479 F.3d at 315 (alteration in original). The factual dissimilarities between *Holmes* and *Elston* on the one

---

[2]The majority further factors in its *Long* analysis the fact that some onlookers, including someone who may have known Griffin (Maj. Op. at 8 n.5), were present at the scene of the *Terry* stop. The district court relied heavily on this reasoning to justify its ruling on the protective search, and the government has urged us also to consider this factor. Yet, neither the district court, the government, nor the majority cites any law to support the proposition that concerns about danger from people other than the suspect, and who have no clear connection to the suspect, can justify a protective search of the suspect's vehicle. *Long* itself takes the position that officers must have a reasonable belief "that *the suspect* is dangerous and *the suspect* may gain immediate control of weapons." 463 U.S. at 1049 (emphasis added).

hand and this case on the other are patent enough that I need not linger on them.

A closer factual analogue in many ways comes from our decision in *United States v. Neely*, No. 08-4257, 2009 U.S. App. LEXIS 9111 (4th Cir. Apr. 29, 2009). In *Neely*, we found that acting nervous and stumbling, even in a high crime area, was not enough to create a reasonable belief that the defendant posed the kind of danger needed to justify a search under *Long*. *Id.* at *13-15. The *Neely* panel admittedly termed it a "close case" and suggested that "several facts present here, under different circumstances, might counsel a different result." *Id.* at *15. But the only evidence here that might suggest circumstances different from those present in *Neely* is the informant's incriminating, but limited and wholly unreliable, tip. Thus, a reasoned application of our precedent leads to the conclusion that, as in *Neely*, this search was not protected by *Long*.[3]

III.

Today's decision effectively holds that anytime someone provides officers with a face-to-face "man with a gun" tip, at least in a "high crime area," the officer has been given both a sufficiently reasonable suspicion of criminal activity to justify a *Terry* stop and a sufficiently reasonable belief of the suspect's dangerousness to justify a protective search under *Long*. This troubling result is cleverly cloaked in overbroad readings of this Court's precedent—*Christmas*, *Holmes*, and *Elston* —but it plainly undermines the Supreme Court's decision in *J.L.* A fair reading of the case law shows that Griffin's

---

[3]Having concluded that the first prong of the *Long* analysis is not met, it is not necessary to decide whether an officer had a "reasonable belief" that "the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049. While the majority's dismissive view of the implications of *Arizona v. Gant*, 129 S. Ct. 1710 (2009) on today's case gives me pause, I do agree that the Court in *Gant* did not decide the issues now before us.

motion to suppress should have been granted on both grounds, and I therefore dissent.