**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-4133**

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

        v.

XAVIER D. ECCLESTON, a/k/a Xavier Daniel Eccleston, a/k/a X,

                Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Alexander Williams, Jr., District Judge. (8:11-cr-00567-AW-3)

Argued: March 25, 2015                    Decided: July 31, 2015

Before MOTZ and GREGORY, Circuit Judges, and Mary Geiger LEWIS, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Motz and Judge Lewis joined.

**ARGUED:** Anthony Douglas Martin, I, ANTHONY D. MARTIN, PC, Greenbelt, Maryland, for Appellant. David Ira Salem, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

In this federal drug conspiracy case, the defendant-appellant, Xavier Eccleston, alleges that the district court made numerous errors before and during trial, as well as during sentencing. Because the district court did not abuse its discretion or err in its pretrial, trial, or sentencing rulings, we affirm.

**I.**

**A.**

Eccleston and nineteen co-defendants were charged in a criminal complaint on September 22, 2011 with one count of conspiracy to posses with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine and 280 grams or more of a mixture or substance containing a detectable amount of cocaine base, commonly known as crack cocaine. The complaint was based in part on evidence obtained through execution of a warrant issued pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2522 ("Title III").

Eccleston appeared before the district court on September 28, 2011 and a magistrate judge signed an "order of detention by agreement" on that same day. He was indicted on the charges set forth in the criminal complaint on October 26, 2011. On

2

November 2, 2011, he was arraigned and entered a plea of not guilty. The district court initially set a motions hearing date of December 16, 2011 and a trial date of January 3, 2012.

On November 2, 2011, the government filed, and none of the defendants opposed, a motion to exclude time under the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. In support of its motion, the government cited: "(1) . . . two charged defendants who have been fugitives for approximately one month; (2) . . . voluminous discovery the government must produce and defense counsel must analyze; and, (3) the unusual and complex nature of the case." J.A. 1128. In granting the motion, the district court found that it was necessary to toll the speedy trial clock not only pursuant to 18 U.S.C. § 3161(h)(6) due to the fugitives, but also pursuant to 18 U.S.C. § 3161(h)(7) because the "interests of justice" outweighed the interest in a speedy trial. The court stated that it was necessary to toll the clock to "provide the defendants and defense counsel sufficient time to review fully all of the voluminous discovery materials and to prepare and file pretrial motions" and to give "defense counsel and the [g]overnment the reasonable time necessary for effective preparation." J.A. 116 (observing that the case "involve[s] wiretap evidence, including more than 10,000 pertinent calls captured from at least three different wiretapped phone lines"). The order excluded from the speedy trial clock the time between

3

the date of the order, November 21, 2011, and the date of the initial appearance of the last fugitive defendant. The order further excluded any time between the date of the initial appearance of the last fugitive defendant and the trial date, which the court planned to set at a later date.

On December 15, 2011, the government filed a motion to take the December 16, 2011 motions hearing date off of the calendar, and to convert the January 3, 2012 trial date to a status conference. Defense counsel consented to the motion. Though no order granting the motion appears on the docket, the district court apparently did so; it issued an informal January 3, 2012 letter order stating that pretrial motions were due by April 17, 2012 and that trial would commence on August 21, 2012.

Eccleston had previously written to his counsel on November 9, 2011 indicating that he did not want to waive his speedy trial rights. He wrote to counsel again on December 22, 2011, reiterating that he objected to a speedy trial waiver. On January 3, 2012, Eccleston's attorney filed a motion for a speedy trial pursuant to both the Sixth Amendment and the Speedy Trial Act.[1] In addition to his speedy trial motion, Eccleston filed several pretrial motions on January 21, 2012, among

---

[1] Although the docket text reflects that the government was to respond by January 20, 2012, no response was filed on that date.

others:  (1) a motion for Disclosure by Government of Intent to Use Uncharged Misconduct and Prior Convictions (the "404(b) Motion"); and (2) a motion for sequestration of witness.[2]

On January 23, 2012 Eccleston sent a letter to the district court; the letter was dated January 10, 2012.  His letter stated:  "[s]ince day one, I have been adamant about my desire for a speedy trial.  . . .  I haven't consented to any delays and never gave any inclination to my attorney that I would." J.A. 1112.  He argued also that (1) the fugitive defendants were not named on the indictment and thus could not be properly considered his co-defendants for purposes of tolling the speedy trial clock; (2) the case was not complex, but rather an ordinary street crime; (3) the government had failed to provide complete discovery despite promises to do so; and (4) the factors set forth in Barker v. Wingo, 407 U.S. 514 (1972), which courts use to determine whether a defendant has suffered prejudicial delay in bringing his case to trial, weighed in his favor.  Eccleston sent the district court another letter on April 9, 2012 (dated April 8, 2012) indicating that he had not authorized counsel to enter into a discovery agreement with the government, and that in any event, he believed that the

_____

[2] The government responded to these motions on January 30, 2012.

5

government had breached the agreement. He sent a third letter to the court on June 1, 2012, again requesting "independent access to my discovery so I can properly prepare my defense."[3] J.A. 1119.

On April 17, 2012, Eccleston's counsel filed additional pretrial motions, among which were: (1) a second motion for a speedy trial; (2) a motion to suppress the Title III wiretaps; and (3) a motion to dismiss the indictment on speedy trial grounds. The government filed a response to these motions on May 14, 2012. The government's May 14 filing was the first time that it responded to Eccleston's speedy trial motions.

Eccleston's pretrial motions hearing took place on July 25, 2012. During the hearing, the district court granted the government's request to delay the beginning of trial to September 11, 2012, due to a government counsel's health concerns. The court then ruled on Eccleston's pending motions. As relevant here, the court granted his motions for notice of the government's intent to use 404(b) evidence and for sequestration of witness, and denied his speedy trial motion,

---

[3] Counsel explained during the pretrial motions hearing that Eccleston requested personal copies for his review while in jail. However, counsel represented that the discovery agreement prevented him from giving Eccleston such copies, because it allowed only for Eccleston to review discovery during meetings with counsel.

6

motion to suppress evidence obtained from the Title III warrants. The court also denied his request for a <u>Franks</u> hearing concerning the Title III warrant application.[4]

On August 8, 2012, the grand jury returned a fourth superseding indictment.[5] The indictment removed certain defendants, and also included new charges against Eccleston. Specifically, the fourth superseding indictment added two counts of possession with intent to distribute cocaine (counts nine and eleven) in violation of 21 U.S.C. § 841, as well as two counts of using a telephone in furtherance of a drug trafficking offense (counts eight and ten) in violation of 21 U.S.C. § 842(b). Eccleston was arraigned on the fourth superseding indictment on the first day of trial, September 11, 2012.

**B.**

The trial took place from September 11-19, 2012. The government called several witnesses, including co-defendants and others who were cooperating with the government: Christopher Rainey, Decarlos Bryant, Antonio Marshall, Kenneth Smith, and Gavin Wallis.

---

[4] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

[5] Previous indictments had added a forfeiture allegation, and added or removed defendants.

Rainey testified that he sold drugs in the Kentland, Maryland area in concert with co-defendant Phillip Whitehurst, who ran the operation. According to Rainey, "it was a 24/7 operation" that was managed from three different stash houses in the Kentland area. J.A. 462-63. The drug ring sold both crack and powder cocaine. He witnessed Eccleston and other co-defendants purchase distribution quantities of powder cocaine from Whitehurst on several occasions. However, he disclaimed personal knowledge of what Eccleston did with the powder. Rainey further testified that Eccleston stopped by the stash houses to watch TV, do drugs, drink, and socialize. While Eccleston was at the stash houses, others would often stop by to purchase both crack and powder cocaine. The government also introduced several audio recordings of phone calls through Rainey. The audio was obtained pursuant to the Title III wiretap warrant. During the phone calls, Eccleston and Whitehurst discussed purchases of powder cocaine.

During Rainey's testimony, Eccleston's counsel approached the bench to report that witnesses had been speaking with one another in holding cells and in the hallway. He asked the district court to direct government counsel to remind witnesses of the sequestration order. However, counsel did not make any representation that the conversations were about the trial or about trial testimony. The district court ruled that there was

8

no evidence of a violation of the sequestration order. The court nonetheless reminded government counsel to admonish witnesses not to speak with each other about the case.

Later, Smith testified that he also had sold distribution quantities of powder cocaine to Eccleston. Additional audio recordings concerning Eccleston's purchases were also introduced through Smith. On these recordings, Whitehurst stated that Eccleston was purchasing powder, cutting it with baking soda or other substances, and then selling it.

Marshall similarly testified that he had sold distribution quantities of powder cocaine to Eccleston.

Wallis was granted immunity for his testimony. He and Eccleston met in high school, and more recently, Eccleston had agreed to provide personal training sessions to Wallis free of charge. Wallis testified that he had purchased cocaine from Eccleston five to ten times, each time between one and ten grams. He was not charged as part of the conspiracy, and testified that he had never been convicted of a crime.

The government also introduced testimony from Montgomery County Police Detective Robert Grims, who arrested Eccleston pursuant to an arrest warrant. He searched Eccleston and found two cell phones. He then searched one of these cell phones without first obtaining a warrant for that search.

9

Months after Detective Grims searched the phone, and shortly before trial, the FBI obtained a search warrant and searched the phone. Eccleston objected during trial to the introduction of certain evidence obtained in connection with the searches and moved to suppress that information. The district court took a trial recess in order to allow counsel to do legal research. The court then held a suppression hearing and took testimony from Detective Grims. The district court ultimately denied the motion to suppress, finding that then binding appellate law permitted the warrantless search. The district court further found that the subsequent warrant application was based on information known prior to the search and seizure of the phones, and that the subsequent search was not tainted by the first search.

Near the end of trial, the following colloquy took place between defense counsel and FBI Special Agent Mark E. James:

> Q. Well you knew he was staying there [at the residence where Eccleston was living], didn't you?
>
> A. We suspected that he was staying there based on some physical surveillance and records, I believe, we got from parole and probation. Yes.

J.A. 977. Despite Agent James' reference to "parole and probation," Eccleston did not object or request a curative jury instruction either at the time or during a later discussion with the court about jury instructions.

10

After the government rested its case, Eccleston moved for a judgment of acquittal, arguing that there was insufficient evidence to convict him for conspiracy with intent to distribute cocaine and cocaine base. He further argued that the evidence supported multiple conspiracies revolving around lead defendant Whitehurst and requested a jury instruction for multiple conspiracies. The motion for judgment and request for the multiple conspiracy instruction were denied.

### C.

The case was then submitted to the jury. During the course of deliberations, the jury sent a note to the court, which read: "Is it possible to alter the [verdict] form from 'and crack cocaine' to 'and/or'?" J.A. 1039. The district court provided the following written response:

> In response to your note, I am clarifying Instruction No. 47,[6] a copy of which I am providing to you. I instruct you that in order to find the defendant guilty of Count One of the Fourth Superseding Indictment, you must find that the government has proved beyond a reasonable doubt the two elements of the offense of conspiracy. With respect to the first element of conspiracy, you must find that two or more people entered into an unlawful agreement to distribute and possess with intent to distribute a controlled substance and you must also unanimously agree which controlled substance -- powder cocaine, crack cocaine, or both -- was involved in the

---

[6] Instruction No. 47 addressed what the government must prove with respect to the first element of conspiracy: the existence of an unlawful agreement.

11

conspiracy. You may find the defendant guilty of Count One if you find that the conspiracy involved powder cocaine or crack cocaine or both, but you must be unanimous as to which form of cocaine was involved. Accordingly, I am submitting to you a slightly revised verdict form to reflect this instruction.

J.A. 1040. The two verdict forms were identical, except that the revised form required the jury to identify which drug (or drugs) it unanimously agreed was involved in the conspiracy. Compare J.A. 1042 (original verdict form for count one), with J.A. 1045 (altered verdict form for count one).

On September 21, 2012, the jury returned a verdict, finding Eccleston guilty of conspiracy to distribute and possess with intent to distribute both powder and crack cocaine. The jury attributed to Eccleston 500 grams to 5 kilograms of powder cocaine, and less than 28 grams of crack cocaine. Eccleston was further found guilty of counts eight, nine, ten, and eleven of the Fourth Superseding Indictment.

Eccleston was sentenced to concurrent sentences of 210 months' imprisonment on count one, 96 months' imprisonment on count eight, 210 months' imprisonment on count nine, 96 months' imprisonment on count ten, and 210 months' imprisonment on count eleven, to be followed by 8 years of supervised release. He was also assessed a $500 criminal monetary penalty. In sentencing Eccleston, the district court "var[ied] down from the guidelines 235 [months' imprisonment] for Count 1." J.A. 1100.

12

This appeal followed. Eccleston advances numerous arguments on appeal. First, he contends that delay between his arrest and the commencement of his trial was unconstitutionally lengthy in violation of the Sixth Amendment, and that the delay also constituted a violation of the Speedy Trial Act. He also contends that it was error for the district court to admit the evidence obtained from his cell phone. He argues that the district court abused its discretion in finding that its sequestration order had not been violated. He also argues that he suffered prejudice under Federal Rule of Evidence 404(b) when a case agent referred to obtaining information from a parole or probation office about his address. Eccleston additionally contends that the district court constructively amended the indictment in this case when it altered the jury verdict form in response to a jury question. He further challenges the district court's refusal to instruct the jury on multiple conspiracies. And finally, Eccleston contends that the district court erred in the amount of cocaine and cocaine base it attributed to him for purposes of sentencing. For the reasons that follow, we reject each of these arguments.

## II.

Eccleston argues that both his constitutional and statutory speedy trial rights were violated. We address each in turn.

13

**A.**

First, Eccleston alleges that the delay between his arrest and the commencement of his trial violated his right to a speedy trial under the Sixth Amendment. We review de novo a district court's constitutional speedy trial determination. United States v. Hall, 551 F.3d 257, 266 (4th Cir. 2009).

The Supreme Court has directed federal courts to consider four factors when addressing Sixth Amendment speedy trial claims: "Length of delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant." Barker, 407 U.S. at 530. "To prevail on [his] speedy trial claim, [a] [d]efendant[] [is] obliged, under Barker, to establish 'that on balance, [the] four separate factors weigh in his favor.'" Hall, 551 F.3d at 271 (final alteration in original).

There are two components to the first Barker factor. Id., 551 F.3d at 271 (citing Doggett v. United States, 505 U.S. 647, 651-52 (1992)). "First of all, a reviewing court must decide whether the length of the delay triggers a speedy trial inquiry. In that respect, the Court has suggested that we should conduct a full inquiry when such a delay approaches one year." Id., 551 F.3d at 271 (citing Doggett, 505 U.S. at 651-52). The relevant time period to consider is that between indictment and the commencement of trial. Id. (citing United States v. MacDonald,

14

456 U.S. 1, 7 (1982)). Notably, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." Barker, 407 U.S. at 531.

Eccleston was first indicted on October 26, 2011, and his trial commenced less than a year later, on September 11, 2012. Indeed, although there was a delay between Eccleston's September 28, 2011 arrest on the criminal complaint and the October 26, 2011 indictment, even the time between the arrest and the trial was less than one year. Moreover, he was charged as part of a large drug conspiracy. Accordingly, the first factor does not weigh in his favor.

Based on the foregoing, we need not consider the remaining factors. See Barker, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."); United States v. Woolfork, 399 F.3d 590, 597 (4th Cir. 2005) ("One year is the 'point at which courts deem the delay unreasonable enough to trigger the Barker [i]nquiry." (citing Doggett, 505 U.S. at 652 n.1)). The first Barker factor "acts as a threshold requirement," and "[i]f the delay is not uncommonly long, the inquiry ends there." United States v. Grimmond, 137 F.3d 823, 827 (4th Cir. 1998). Having failed to

15

clear the threshold requirement, Eccleston cannot show a violation of his Sixth Amendment right.

Our conclusion would be the same even if we were to consider the remaining factors under Barker. The second factor addresses "the reasons for the delay." Barker, 407 U.S. at 530. "The reasons for a trial delay should be characterized as either valid, improper, or neutral. On this factor, a reviewing court must carefully examine several issues, specifically focusing on the intent of the prosecution." Hall, 551 F.3d at 272 (citation omitted). Here, the district court stated that the delay stemmed from the complexity of the case. Indeed, as we will discuss in more detail below, the complexity of the case led the court to grant the government's motion to exclude time under the Speedy Trial Act. Moreover, Eccleston caused delay by filing numerous pretrial motions, all of which by definition had to be resolved prior to the commencement of trial. We find that there were valid reasons for the trial delay.

The third Barker factor addresses whether the defendant timely asserted his right to a speedy trial. Barker, 407 U.S. at 532. Eccleston did so, and this factor thus weighs in his favor.

The final Barker factor requires us to consider the prejudice to Eccleston. Id. Courts assess prejudice "in the

16

light of the interests of defendants which the speedy trial right was designed to protect." Id. at 532. There are

> three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.

Id. As to the first prejudice interest, we note per the first Barker factor that the delay in this case was not presumptively prejudicial and there is no allegation that Eccleston's detention was otherwise oppressive. As to the second prejudice interest, Eccleston has asserted generalized concerns that would affect any individual who is detained. See Opening Br. of Appellant 41 (complaining of economic harm, damaged credit, the inability to advance his skills at work, embarrassment, and missed birthdays). Finally, Eccleston has not argued that his defense was impaired by the delay.[7] See Grimmond, 137 F.3d at 830 (determining that the defendant had not shown impairment of

---

[7] Eccleston argues before this Court that the government refused "to permit him access to discovery materials thus denying him the opportunity to play a more active role in his own defense." Opening Br. of Appellant 42. However, Eccleston did have access to the materials. As counsel explained during the pretrial hearing, the discovery agreement in this case prevented counsel from leaving copies of the discovery material with Eccleston to keep and review while he was in prison. Rather, the agreement allowed Eccleston to review discovery only during meetings with counsel.

17

his defense where he failed to "identif[y] any witness that was unavailable as a result of the delay," did not "allege[] that any witness was unable accurately to recall the events in question," and did "not contend that any exculpatory evidence was lost" or that "any evidence . . . was unavailable because of the delay").

Because only one of the Barker factors weighs in Eccleston's favor, we find that his Sixth Amendment right to a speedy trial was not violated.

**B.**

Eccleston also alleges that the district court erred in excluding time from the speedy trial clock when it granted the government's tolling motion under the Speedy Trial Act. Specifically, he faults the district court for adopting the government's assertion that fugitive co-defendants remained at large, and claims that the fugitive co-defendants were fabricated. He further contends that the government simply was not ready to proceed with trial.

"We review the legal standards applied by the district court in making its ends of justice determination de novo and review the district court's findings under the Speedy Trial Act . . . 18 U.S.C. § 3161, under the clearly erroneous standard." United States v. Keith, 42 F.3d 234, 236 (4th Cir. 1994). The Speedy Trial Act provides that a defendant's trial must commence

18

within seventy days from the filing of the indictment unless one of several exceptions applies. 18 U.S.C. §§ 3161(c)(1), (h). Among other types of excusable delay, those delays attributable to an appropriate "ends of justice" order can be excluded from the speedy trial clock. Id. § 3161(h)(7)(A) (providing for the exclusion of time when a continuance is granted sua sponte or upon a motion by counsel "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant").

Here, the speedy trial clock commenced on November 2, 2011, when Eccleston was arraigned and pleaded not guilty. On that same day, the government filed a motion to toll the speedy trial clock. None of the defendants opposed the motion at that time. In granting the motion, the district court found that

> this case involves complex issues, particularly as they involve wiretap evidence, including more than 10,000 pertinent calls captured from at least three different wiretapped phones lines, and thus it would be unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by the Speedy Trial Act.

J.A. 116. The court further explicitly found that the delay was necessary to ensure continuity of counsel, as well as to ensure that the parties -- both the defendants and the government -- had adequate time to review the discovery materials. J.A. 116; cf. 18 U.S.C. §§ 3161(h)(7)(B)(ii), (iv). Given the nature of

19

the case, as described by the district court and based upon our own review of the record, we hold that the district court did not clearly err in granting the government's motion and tolling the speedy trial clock until August 21, 2012.

We further reject Eccleston's challenge to the delay occurring between the original August 21, 2012 trial date and the actual start of trial on September 11, 2012. Eccleston apparently takes issue with government counsel's request for this additional delay, even though government counsel indicated that he was willing to go forward with trial on August 21 if the court so ordered. The district court granted the government's request due to counsel's serious medical situation. Unavoidable health concerns are a valid reason for granting a reasonable delay. United States v. Trotman, 406 F. App'x 799, 805 (4th Cir. 2011) (unpublished); see also United States v. Hale, 685 F.3d 522, 535 (6th Cir. 2012); United States v. DiTommaso, 817 F.2d 201, 210 (2d Cir. 1987) (holding that a seven week suspension of the speedy trial clock was warranted under the "ends of justice" provision where the chief prosecutor was ill and new assistant prosecutors required time to prepare for

trial).  The district court did not clearly err in delaying the commencement of trial from August 21 to September 11.[8]

## III.

Eccleston makes several arguments considering the use and admissibility of wiretap evidence in his case.  None of his arguments are availing.

## A.

Eccleston first faults the government for failing to exhaust "normal investigative procedures" prior to filing its wiretap warrant application.  He contends that this failure violated his rights under the Fourth Amendment, and that the evidence obtained from the wiretaps thus should have been suppressed.

"We review for clear error the factual findings underlying a district court's ruling on a motion to suppress, and we review the court's legal conclusions de novo."  United States v. Wilson, 484 F.3d 267, 280 (4th Cir. 2007).  Additionally, "we review for abuse of discretion determinations of necessity under" Title III.  Id.  As we have previously noted, "wiretaps are necessary tools of law enforcement, . . . particularly where

---

[8] Because we find no error in the district court's "ends of justice" ruling, we need not address its other bases for tolling the clock.

21

crimes are committed by large and sophisticated organizations," and "[c]ourts must be careful not to read the statute in an overly restrictive manner." Id. at 281.

The government bears the burden of demonstrating the necessity of a wiretap "via a full and complete statement as to whether 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" Id. at 281 (quoting 18 U.S.C. § 2518(3)). But this burden "is not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not hamper unduly the investigative powers of law enforcement agents." Id. (quoting United States v. Smith, 31 F.3d 1294, 1298 (4th Cir. 1994)). In Wilson, this Circuit found that the government adequately demonstrated the necessity of a wiretap by submitting a detailed affidavit in support of its wiretap application. 484 F.3d at 281. The affidavit "span[ned] 64 pages in the Joint Appendix." Id. The Circuit observed of the affidavit:

> In exhaustive fashion, [the government] set forth the techniques that had been used up to that point. Those techniques included confidential informants, undercover agents, surveillance, trash searches, interviews, search warrants, telephone records, reverse buys, GPS trackers, and financial and public records. The affiants then explained that despite the information they had been able to gain from these traditional sources, they believed that those sources, standing alone, were insufficient to achieve the goals of the investigation and prove the extent of the

22

> conspiracy. For example, they explained that confidential informants were unable to identify the higher-ups of the conspiracy. The traditional sources also failed to uncover the conspiracy's cocaine source and the extent to which the coconspirators distributed it for resale.

Id. (citation omitted).

The government has satisfied its burden here. In Eccleston's case, as in Wilson, the government has presented a detailed affidavit concerning "whether 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" Id. at 281 (quoting 18 U.S.C. § 2518(3)). The forty-five page Affidavit in Support of an Application for an Order Authorizing the Interception of Wire Communications was submitted by FBI Special Agent Mark E. James to a district judge on March 3, 2011. The Affidavit details the normal investigative techniques used during the course of the investigation, including: physical surveillance, confidential informants, cooperating sources, undercover agents, interviews of subjects or associates, search warrants, pen registers/toll records, and trash cover. For each investigative category, James set forth whether the normal techniques had been used; how well they had worked; and whether there was additional information needed for the investigation that was unavailable from further use of that technique. He also was forthcoming about which techniques, such

23

as physical surveillance, had been fruitful and would continue to be used going forward. J.A. 1177 (discussing success with physical surveillance, but observing that heavy foot traffic in the area, as well as the targets' use of different vehicles registered in others' names, thwarted efforts at identification of additional conspirators). For techniques that had not been used, such as grand jury subpoenas, he explained why they would not be useful or would be counterproductive. J.A. 1177-78 (explaining that the use of subpoenas would alert the conspirators to the investigation and might cause them to flee or to threaten potential witnesses). We find that the level of specificity in the Affidavit sufficient to meet the government's burden, and thus the issuing court did not abuse its discretion in authorizing the wiretap, and the district court did not err in denying Eccleston's motion to suppress.

**B.**

Eccleston separately contends that there was insufficient and "misleading" probable cause to support the wiretap application. "The probable cause required for issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a search warrant." United States v. Talbert, 706 F.2d 464, 467 (4th Cir. 1983). And the probable cause determination is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before

24

[the judge] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Courts look to the "totality-of-the-circumstances" in making their decisions. Id. Reviewing courts "must accord great deference to the magistrate's assessment of the facts presented to him." United States v. Montieth, 662 F.3d 660, 664 (4th Cir. 2011) (internal quotation marks and citation omitted).

Here, given the nature and specificity of the information in the Affidavit, we find that there was probable cause to grant the wiretap application. James stated that the facts set forth in the Affidavit were based in part on his personal knowledge and in part on information and belief. He based his information and belief on, among other things, reports received from other field agents and law enforcement officials, his review of various telephone records and consensually recorded interviews, his review of evidence, and debriefings. Information from a number of confidential sources was incorporated into the Affidavit where specified. The Affidavit set forth several detailed, specific facts to support the existence of probable cause to believe that several individuals, known and unknown, were engaged in a conspiracy to distribute cocaine and cocaine base in Kentland. For example, the Affidavit discussed controlled purchases of crack cocaine carried out by

confidential sources at the direction of law enforcement. Moreover, it set forth specific facts suggesting that there was probable cause to believe that the target phone numbers would yield information concerning the alleged drug conspiracy. For example, the Affidavit included excerpts from wiretaps executed earlier in the investigation, and also described information obtained from pen registers concerning numbers known to be associated with the conspiracy. Because there was probable cause to authorize the wiretaps, the district court did not abuse its discretion in refusing to suppress the evidence obtained from the wiretaps.

## c.

Finally, Eccleston argues that the district court erred by denying him a Franks hearing. In particular, he alleges that two of the five confidential sources whose information formed part of the basis of James' Affidavit were engaging in unauthorized drug dealing activity and that one of these two informants was killed during the unauthorized activity. Moreover, Eccleston contends that "the task force knew or should have known that the lead defendant [Whitehurst] was a murder suspect and had an outstanding warrant for his arrest." Opening Br. of Appellant 25. Eccleston faults the government for failing to include this information in the Affidavit and argues

26

that the district court would have denied the wiretap application had the information been included.

The Supreme Court held in Franks that,

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. at 155-56. In addition to false statements, "Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (emphasis deleted).

This Court reviews the legal determinations underlying a district court's denial of a Franks hearing de novo, and its factual findings for clear error. United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011). To warrant a Franks hearing, a defendant's preliminary "showing 'must be more than conclusory' and should include affidavits or other evidence to overcome the 'presumption of [the warrant's] validity.'" United States v. Clenney, 631 F.3d 658, 663 (4th Cir. 2011) (quoting Franks, 438 U.S. at 171). Where a defendant "rel[ies] on an omission, rather than on a false affirmative statement," his "burden increases yet more." United States v. Tate, 524 F.3d 449, 454

27

(4th Cir. 2008). "[M]erely showing an intentional omission of a fact from a warrant affidavit does not fulfill Franks' requirements." Id. at 455. Rather, "[t]o satisfy the Franks' intentional or reckless falsity requirement for an omission, the defendant must show that facts were omitted 'with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading.'" Id. (quoting Colkley, 899 F.2d at 300).

Here, Eccleston offers only a conclusory showing that a Franks hearing would be appropriate. Despite Eccleston's insistence that the lead defendant in the conspiracy was subject to an outstanding warrant, he has presented no documentary proof to that effect. And though he questions the reliability of the information in James' Affidavit, he does not demonstrate that Special Agent James had any intent to mislead the court. See Colkley, 899 F.2d at 301 ("Here Johnson made no showing, and the district court possessed no evidence, that agent Moore had the requisite intent to mislead."). While some courts have inferred intent where "the omitted material was 'clearly critical' to the finding of probable cause," id., that showing cannot be made here. James' Affidavit relied on information from three additional confidential sources aside from those challenged here. At least one of these additional confidential sources participated in controlled purchases of crack cocaine at the direction of law enforcement. Furthermore, the Affidavit relied

28

on reports from law enforcement officials, review of pen register and documentary evidence, and personal knowledge.

Eccleston points to two other pieces of information missing from the Affidavit: the unauthorized criminal activity by one of the confidential sources and the murder and unauthorized drug dealing activity of another of the confidential sources. This information is not "critical" to the probable cause determination. We note first that we cannot with certainty say that the information with which Eccleston takes issue was not contained in the Affidavit, because much of the Affidavit is redacted. Even so, the Affidavit stated that the information from the sources had been independently corroborated through other investigative techniques. And though it did not go into detail, the Affidavit also acknowledged that one confidential source died during the course of the investigation. The information about the killing and the unauthorized drug dealing was later disclosed to the district court in Special Agent Garrett Swick's "Affidavit in Support of Criminal Complaint and Arrest Warrants."

Even without information about the murder or the unauthorized illegal activity, there is sufficient, independent probable cause outlined in the James' Affidavit for the issuance of the wiretap warrant. We find that Eccleston has not made a

29

preliminary showing sufficient to warrant a <u>Franks</u> hearing. The district court properly denied his request.

**IV.**

Eccleston argues that the district court erred in admitting evidence obtained from his cell phone. In particular, he contends that the warrantless search of his cell phone at the time of his arrest violated the Fourth Amendment, and that the later application for and issuance of a search warrant for the phone did not cure the violation.

"This Court reviews evidentiary rulings for an abuse of discretion, and 'will only overturn an evidentiary ruling that is arbitrary and irrational.'" <u>United States v. Cone</u>, 714 F.3d 197, 219 (4th Cir. 2013) (citation omitted). "A court has abused its discretion if its decision 'is guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'" <u>United States v. Johnson</u>, 617 F.3d 286, 292 (4th Cir. 2010) (citation omitted).

**A.**

The United States Supreme Court recently held that, upon lawful arrest, "officers must generally secure a warrant before conducting" a search of a cell phone. <u>Riley v. California</u>, -- U.S. ---, 134 S. Ct. 2473, 2485 (2014). There is no dispute that <u>Riley</u> applies to this case. However, while "the

30

retroactive application of a new rule of substantive Fourth Amendment law <u>raises</u> the question whether a suppression remedy applies[,] it does not answer that question." <u>Davis v. United States</u>, --- U.S. ---,131 S. Ct. 2419, 2431 (2011) (citing <u>United States v. Leon</u>, 468 U.S. 897, 906 (1984)). Rather, "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." <u>Leon</u>, 468 U.S. at 907 (internal quotation marks and citation omitted); <u>see also</u> <u>Davis</u>,131 S. Ct. at 2431 (2011) ("Retroactive application does not . . . determine what 'appropriate remedy' (if any) the defendant should obtain.").

The exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." <u>Leon</u>, 468 U.S. at 919; <u>see id.</u> ("If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." (quoting <u>United States v. Peltier</u>, 422 U.S. 531, 542 (1975))); <u>see also</u> <u>Davis</u>, 131 S. Ct. at 2431. Thus, "[b]ecause suppression would do nothing to deter police misconduct" in cases where "the police

conduct a search in compliance with binding precedent that is later overruled," and "because [suppression] would come at a high cost to both the truth and the public safety, . . . searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." Davis, 131 S. Ct. at 2423-24.

At the time of Eccleston's arrest, binding appellate precedent from this Circuit permitted the warrantless search of his cell phone incident to his arrest. See United States v. Murphy, 552 F.3d 405, 410-12 (4th Cir. 2009). In Murphy, the defendant argued that the warrantless search of his cell phone was unlawful "because there was no evidence of the volatile nature of the cell phone's information," and also because the search "was not contemporaneous with his arrest." Id. at 411. We rejected the defendant's arguments, observing that "this Court ha[d] held on at least two prior occasions, albeit in unpublished opinions, that officers may retrieve text messages and other information from cell phones and pagers seized incident to an arrest." Id. (citing United States v. Young, 278 F. App'x 242, 245-46 (4th Cir. 2008), cert. denied, 555 U.S. 1006 (2008), and United States v. Hunter, No. 9604259, 1998 WL 887289, at *3 (4th Cir. Oct. 29, 1998)). This Court further observed that "the initial search of the cell phone occurred in Murphy's presence and at his direction," and another search

32

occurred at the police station "during the course of the inventory search." Id. at 412. Accordingly, we held that the district court committed no error when it refused to suppress the contents of the defendant's cell phone.

Prior to the Supreme Court's decision in Riley, Murphy served as binding appellant precedent permitting the search of Eccleston's cell phone incident to his arrest without a warrant. Because the search was "conducted in objectively reasonable reliance on [then-]binding appellate precedent," it is "not subject to the exclusionary rule." Davis, 131 S. Ct. at 2423-24. We therefore hold that the district court did not abuse its discretion in refusing to suppress the evidence obtained from Eccleston's cell phone.

**B.**

Regardless of the applicability of Murphy at the time of Eccleston's arrest, and as the district court held, the same information was later lawfully obtained by the FBI pursuant to a search warrant. Eccleston did not challenge the validity of the warrant below. He argues here that the district court did not address whether the initial search tainted the warrant.

It is well established that where the government can show "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [for the exclusionary

33

rule] has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444 (1984); see also United States v. Whitehorn, 813 F.2d 646, 650 n.4 (4th Cir. 1987) ("[T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible."); Simmons v. Poe, 47 F.3d 1370, 1378 (4th Cir. 1995) (finding, in the 42 U.S.C. § 1983 context, that defendant's challenge to the validity of a warrant was meritless where there "existed sufficient independent evidence in the warrant application to justify the magistrate's finding of probable cause").

Here, the district court explicitly stated: "[T]here's no indication at all that the alleged unlawful search, if it was an unlawful search, . . . tainted the subsequent application for a search warrant. In fact, [the government] read portions of the application. It had no reference at all to what occurred back on" the date of Eccleston's arrest. J.A. 626; see also J.A. 622 (discussing contents of warrant application). We agree. Eccleston did not challenge the warrant on any grounds, and does not meaningfully do so before this Court. In fact, when asked by the district court if the warrant had been challenged, Eccleston's counsel stated: "I'm not trying to say that because

34

of what [Grims] did everything after that is tainted, because I think at some point the government realized, yeah, we do need a warrant. And so, they went and they got it, and they did the right thing." J.A. 623. Because the government presented evidence that the search did not taint the warrant, and because Eccleston presented no evidence or arguments to the contrary, the second search of Eccleston's cell phone pursuant to the FBI warrant was not tainted by the initial warrantless search. The district court did not abuse its discretion by refusing to suppress the evidence obtained from the search of Eccleston's cell phone.

## V.

Eccleston argues that the district court's sequestration order was violated due to cohabitation of witnesses in a holding cell, which in turn undermined his Fifth Amendment due process rights. As noted above, we review a trial court's evidentiary rulings for abuse of discretion. Cone, 714 F.3d at 219.

This Court has not directly addressed this type of challenge to a sequestration order, but case law from the First and Eleventh Circuits is instructive. In United States v. Sepulveda, the First Circuit stated that cohabitation of witnesses did not equate to an automatic violation of the trial court's sequestration order. 15 F.3d 1161, 1176-77 (1st Cir.

35

1993). In that case, the district court granted the defendants' motion for sequestration. The motion did not "indicat[e] to the court what level of restraint [the defendants] thought appropriate." Id. at 1176. Accordingly, "[t]he court granted the motion in its simplest aspect, directing counsel 'to monitor sequestration' and ordering 'that witnesses who are subject to [the court's] order are not to be present in the courtroom at any time prior to their appearance to render testimony.'" Id. The court additionally admonished witnesses not to discuss their testimony with other witnesses. Id. The defendants later sought to vacate their convictions based, in part, on alleged violations of the sequestration order. In affirming the district court's denial of relief, the First Circuit indicated that "[t]he crux of sequestration . . . is communication between witnesses, not shared accommodations or geographic proximity. . . . We assume that witnesses, like all other persons subject to court orders, will follow the instructions they receive." Id. at 1177. And "if [the defendants] desired a more vigorous sequestration regime, such as an edict that would have banned cohabitation or other contact amongst prisoner-witnesses, they had a duty to ask for it." Id. Where the defendants failed to do so, and where their claims of the prejudice from the alleged violation of the sequestration order were "speculative," the

district court did not err in refusing to vacate the convictions. Id.

The Eleventh Circuit faced a more extreme situation. In United States v. Eyster, at least two witnesses admitted to discussing testimony with each other while confined together in jail during trial. 948 F.2d 1196, 1210 (11th Cir. 1991). The circuit court found a violation of the district court's sequestration order, and noted that "both the district court and the government were lax in upholding the sequestration rule." Id. at 1211. However, because the district court had allowed cross examination on the issue, the Eleventh Circuit held that the district court had sufficiently cured the violation by "giving the jury the opportunity to evaluate [the witnesses'] credibility." Id. Accordingly, the district court had not abused its discretion in denying the appellants' motion for a mistrial. Id.

We need not rule on the entire universe of potential sequestration violations in order to address Eccleston's claims. There is no admission or direct allegation in this case, as there was in Eyster, that any of the witnesses actually discussed testimony while confined together. Thus, we address our inquiry to whether cohabitation alone is sufficient to violate a district court's sequestration order. With respect to this question, we find the First Circuit's analysis in Sepulveda

37

persuasive. We hold today that the cohabitation of witnesses in a holding cell is ordinarily insufficient to constitute a violation of a district court's sequestration order where the defendant has failed to request a sequestration order explicitly banning cohabitation of witnesses, and where the defendant presents only speculation that a sequestration order has been otherwise violated.

Evaluated in this light, Eccleston's challenge must fail. Eccleston moved for sequestration of witnesses without making any request for witnesses to be housed separately. See ECF No. 105, United States v. Xavier Eccleston, Case No. AW-11-CR-0567 (filed Jan. 21, 2012) (Motion for Sequestration of Witnesses). The district court granted the motion without including any such requirement. The court's order provided: "the court will sequester the witnesses and instruct them to remain outside the courtroom and not discuss their testimony with one another and we will hold the lawyers responsible for that." J.A. 179.

Beyond cohabitation, Eccleston points to no evidence that the sequestration order was otherwise violated. On the third day of trial, Eccleston's counsel, expressed sequestration concerns to the court citing certain witnesses' cohabitation, as well as having seen two witness who had not yet testified talking in the hallway. J.A. 577. The court directed government counsel to notify the witnesses and the marshal's

38

office once more that the witnesses were not to discuss their testimony with one another, but added that it was "not sure what [defense counsel] is alluding to when he says [the witnesses] were talking. I mean, they could have been talking about anything." J.A. 578. The court stated further that it had not heard any "representation that they're talking about the testimony." J.A. 578. Defense counsel responded "I can't make that representation to the court because I don't know that, Your Honor." J.A. 578. The court then stated that it found no violation of the sequestration order. At no point during this exchange or otherwise did defense counsel request that the cooperating witnesses be physically separated from one another in the holding cells.

Throughout the remainder of the trial, the court admonished some of the witnesses, but not all, that they were not to discuss their testimony with one anyone. Eccleston's counsel inquired of some witnesses, but not all, whether they had discussed the trial with others. They testified that they had not. Government counsel made similar inquiries. The witnesses denied speaking with one another about their testimony, and indicated that the holding cells were too loud and too public to permit a private conversation. Some witnesses testified that they were also eventually physically separated from one another.

In sum, Eccleston did not request physical separation of witnesses in his motion or in his verbal exchange with the court, and cohabitation alone did not violate the sequestration order. In any event, Eccleston failed to present any evidence to the court that the witnesses had in fact discussed their testimony. The court repeatedly admonished witnesses to refrain from discussing their testimony with other witnesses, and also directed the government to so advise its witnesses. Additionally, on cross examination, the witnesses who were asked uniformly testified that they had not discussed their testimony with one another. Bearing all of this in mind, we find that the district court did not abuse its discretion in ruling that there had been no violation of the sequestration order.

## VI.

Eccleston argues that Federal Rule of Evidence 404(b) was violated when a case agent made reference to Eccleston's parole and probation officer, thereby causing substantial prejudice. He further contends that the district court compounded the problem by its "refusal to give a curing instruction."[9] Opening Br. of Appellant 50.

---

[9] Eccleston seems to abandon his final point about aggravation in his reply brief. See Reply Br. of Appellant 21 ("It was difficult if not impossible for the defense to recover (Continued)

40

Rule 404(b) "prevents the government from using a defendant's prior bad conduct to suggest his propensity to commit a crime." United States v. Campbell, 935 F.2d 39, 44 (4th Cir. 1991). We review a district court's admission of evidence of prior bad acts for abuse of discretion. United States v. McBride, 676 F.3d 385, 395 (4th Cir. 2012). "While we have reversed convictions in cases where evidence of other crimes had been improperly presented, in those cases the inadmissible evidence was not only prejudicial, but had been purposely introduced by the prosecution." United States v. Johnson, 610 F.2d 194, 197 (4th Cir. 1979); see also Campbell, 935 F.2d at 44 ("Certainly it was not error for the district court to fail to exclude evidence elicited by [the defendant's] own counsel.").

We find that the district court did not abuse its discretion in allowing the testimony at issue. As discussed above, the district court granted Eccleston's 404(b) Motion prior to trial, thereby requiring the government to notify him of its intent to introduce evidence of uncharged conduct or prior convictions. In setting forth his 404(b) argument before

---

from the impression left that the Appellant was a recidivist, because the agent was the last witness called and any curing instruction would have only highlighted the point.").

41

this Court, Eccleston states that a case agent made reference to Eccleston's parole and probation officer on the last day of trial. His challenge is aimed at the testimony from James, specifically the following exchange between Eccleston's counsel and James:

Q. Well you knew he was staying there [at the residence where Eccleston was living], didn't you?

A. We suspected that he was staying there based on some physical surveillance and records, I believe, we got from parole and probation. Yes.

J.A. 977. This testimony, which was elicited by Eccleston's counsel, does not implicate Rule 404(b). See Campbell, 935 F.2d at 44. Moreover, although Eccleston faults the district court for its "refusal" to give a curative instruction, we note that he never requested such an instruction at the time.[10] Further, when discussing the jury instructions after the conclusion of all testimony, Eccleston noted his exception to instructions 21, 22, 36, 37, 38, 39, and 40. A review of those instructions reveals that none addresses prior bad acts or uncharged conduct. Given that the testimony was elicited by Eccleston's counsel, and given that there was no objection to the testimony, we find

---

[10] Eccleston erroneously states in his opening brief that a bench conference followed and addressed potential prejudice stemming from James' testimony. Rather, an unrelated bench conference occurred prior to James' testimony.

that the district court did not abuse its discretion in permitting the testimony.

We stress that the fact that Eccleston's counsel elicited the testimony is not dispositive. Rather, we view that fact in conjunction with the reality that Eccleston's counsel failed to request a curative instruction, the fact that the government did not later refer to the challenged testimony in an attempt to establish Eccleston's general character, and the overwhelming evidence presented by the government. Under these circumstances, we cannot find that the district court abused its discretion in permitting the testimony. Even if the district court did abuse its discretion, we find that the weight of the government's case against Eccleston rendered any error harmless. See, e.g., United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996) ("Furthermore, any error was at most harmless error. The evidence of Chin's guilt provided in government videotapes and audio recordings was overwhelming.").

## VII.

Eccleston argues that the evidence presented by the government did not support his conviction of the charges in the indictment. He contends that the jury note at issue in this case demonstrates that the jurors did not think he was involved in the crack cocaine aspect of the conspiracy. Moreover, he

43

argues that the district court's response to the jury note and subsequent amendment of the verdict form resulted in an impermissible constructive amendment of the indictment and allowed the government "to have Mr. Eccleston convicted of a conspiracy to distribute cocaine or crack; when he was charged with conspiracy to distribute cocaine and crack." Opening Br. of Appellant 14 (emphasis added).

"We review a district court's decision to respond to a jury's question, and the form of that response, for an abuse of discretion." United States v. Foster, 507 F.3d 233, 244 (4th Cir. 2007). And "in responding to a jury's request for clarification on a charge, the district court's duty is simply to respond to the jury's apparent source of confusion fairly and accurately without creating prejudice." United States v. Smith, 62 F.3d 641, 646 (4th Cir. 1995). Reversal is warranted only where the district court's response "is prejudicial in the context of the record as a whole." Foster, 507 F.3d at 244.

"A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." Foster, 507 F.3d at 242. Constructive amendments are "fatal variances because 'the indictment is altered to change the

44

elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" Id. (quoting United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999)). We have stated that "[c]onstructive amendments are error per se and, given the Fifth Amendment right to be indicted by a grand jury, 'must be corrected on appeal even when not preserved by objection.'" Id. (quoting United States v. Floresca, 38 F.3d 706, 714 (4th Cir. 1994) (en banc)). In determining whether an amendment has occurred, "it is the broadening itself that is important—nothing more." Floresca, 38 F.3d at 711. "The key inquiry is whether the defendant has been tried on charges other than those made in the indictment against him." Foster, 507 F.3d at 242-43; see also Floresca, 38 F.3d at 710 ("The court's instruction . . . was more than just a misstatement of the law applicable to the indicted offense; it stated a distinct, unindicted offense. It was by no means only a slight defect in the charge [that] could be cured by other circumstances." (internal quotation marks and footnote omitted)).

The district court's amendment of the jury verdict form did not create a variance. The fourth superseding indictment uses the conjunctive term "and." The thrust of Eccleston's argument is that the district court's response to the jury note resulted in a constructive amendment because it altered the language of

45

the verdict form from permitting only a finding of conspiracy to distribute powder <u>and</u> crack cocaine, to instead allowing the a finding of conspiracy to distribute powder <u>and/or</u> crack cocaine. But this change does not appear so starkly in the record.  The original verdict form read:

> How do you find the defendant, Xavier Eccleston, as to Count One of the Fourth Superseding Indictment (<u>conspiracy to distribute and possess with intent to distribute cocaine and/or crack cocaine</u>), guilty or not guilty?
>
> Guilty _____          Not Guilty _____
>
> If you find the defendant not guilty of Count One, proceed to Question Two below.  If you find the defendant, Xavier Eccleston, guilty as to Count One, how do you find as to the amount of cocaine attributable to the defendant, Xavier Eccleston?

J.A. 1042 (emphasis added).  The revised form read:

> How do you find the defendant, Xavier Eccleston, as to Count One of the Fourth Superseding Indictment (<u>conspiracy to distribute and possess with intent to distribute cocaine and/or crack cocaine</u>), guilty or not guilty?
>
> Guilty _____          Not Guilty _____
>
> If you find the defendant not guilty of Count One, proceed to Question Two below.  If you find the defendant, Xavier Eccleston, guilty as to Count One, **which drug do you unanimously agree was involved in the conspiracy?**
>
> **Powder Cocaine** _____
> **Crack Cocaine** _____
> **Both powder cocaine and crack cocaine** _____

46

J.A. 1045 (underlined text appears in original indictment, and bolded portion added to revised verdict form). Aside from the bolded text above, the two verdict forms are identical.

As is clear from the text above, the verdict form always provided a disjunctive option to the jury. This makes sense because "[i]t is well settled that conjunctive indictment . . . permits disjunctive consideration of guilt." United States v. Champion, 387 F.2d 561, 563 n.6 (4th Cir. 1967). The Supreme Court has stated that "[t]he general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Turner v. United States, 396 U.S. 398, 420 (1970); see also United States v. Montgomery, 262 F.3d 233, 242 (4th Cir. 2001) (reiterating that "[w]here a statute is worded in the disjunctive, federal pleading requires the Government to charge in the conjunctive. The district court, however, can instruct the jury in the disjunctive" (citation omitted)).

Indeed, this Circuit rejected an argument identical to that advanced by Eccleston, albeit in an unpublished opinion. See United States v. Davis, 270 F. App'x 236, 242 n.2 (4th Cir. 2008) (unpublished). There, we observed that while the statute prohibiting distribution of cocaine or cocaine base is written in the disjunctive, the indictment was charged in the

conjunctive.  Id.  The jury instructions, like the statute, "allowed conviction if either drug was found to be within the scope of the conspiracy in the relevant amount." Id.  We nonetheless determined that "this seeming discrepancy does not actually pose a meaningful variance, and certainly does not undermine Appellants' convictions." Id. (citing Turner, 396 U.S. at 420).  Similarly, we do not find that the district court's amendment of the jury verdict form here posed a meaningful variance.  The amendment simply required the jury to specify which drug or drugs were involved in the conspiracy.  We thus hold that the district court did not abuse its discretion by amending the verdict form.

Aside from the verdict form, Eccleston mistakenly contends that the district court amended Instruction No. 47 to read in the disjunctive.  The district court stated only that it had amended the verdict form in order to clarify Instruction No. 47. Accordingly, the court provided a copy of the existing instruction, explained the instruction, and provided a revised verdict sheet.  By way of explanation, the district court stated:

> In response to your note, I am clarifying Instruction No. 47, a copy of which I am providing to you.  . . . You may find the defendant guilty of Count One if you find that the conspiracy involved powder cocaine or crack cocaine or both, but you must be unanimous as to which form of cocaine was involved.  I am submitting

48

to you a slightly revised verdict form to reflect the instruction.

J.A. 1040. The instruction itself was originally written in the disjunctive, and thus the court's explanation did not meaningfully alter the instruction. See J.A. 1041 (Instruction No. 47) ("The first element which the government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged, which is to distribute and possess with intent to distribute cocaine or cocaine base." (emphasis added)).

In any event, as discussed above, the statute at issue prohibits the distribution of cocaine or cocaine base in the disjunctive. See 21 U.S.C. § 841. Accordingly, it was permissible for the government to charge in the conjunctive and for the district court to instruct the jury in the disjunctive. See Montgomery, 262 F.3d at 242; Davis, 270 F. App'x at 242 n.2. The district court thus did not abuse its discretion by clarifying Instruction No. 47.

## VIII.

Eccleston argues that the district court erred in refusing to give the jury an instruction on multiple conspiracies or an instruction stating that mere presence or association is insufficient for a conviction of a conspiracy charge. Similar

49

to his arguments about constructive amendment of the indictment, he believes that the jury note at issue in this case demonstrates that the jurors did not think he was involved in the crack cocaine aspect of the conspiracy.

We review a district court's decision to refuse to give a jury instruction for abuse of discretion. United States v. Passaro, 577 F.3d 207, 221 (4th Cir. 2009). The refusal to give a requested instruction constitutes reversible error "only when the instruction '(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point of the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.'" Id. (quoting United States v. Lewis, 53 F.3d 29, 32 (4th Cir. 1995)). "Even if these factors are met, however, failure to give the defendant's requested instruction is not reversible error unless the defendant can show that the record as a whole demonstrates prejudice." United States v. Bartko, 728 F.3d 327, 343 (4th Cir. 2013).

## A.

Eccleston argues that the jury's note shows that the jury did not think he was selling crack cocaine. Even if this were true, the jury properly could have found Eccleston guilty of conspiracy to distribute either form of the drug, as was

50

discussed above. Thus, a multiple conspiracy charge would not have cured the problem that he attributes to the jury's note.

An instruction on multiple conspiracies is necessary only "'if such an instruction is supported by the facts.' Hence, '[a] multiple conspiracy instruction is not required unless the proof at trial demonstrates that appellants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment.'" Bartko, 728 F.3d at 344 (citation omitted). Moreover, failure to give the instruction when required "is not reversible error unless a defendant can show that this caused him substantial prejudice." United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996). Substantial prejudice exists when "the evidence of multiple conspiracies" is "so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." Id.

Moreover, we have held that "[w]hether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." United States v. Stockton, 349 F.3d 755, 762 (4th Cir. 2003). On the other hand, "[a] single conspiracy exists where there is 'one overall agreement,' or 'one general business venture.'" United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988). There need not be continuous activity to constitute a single conspiracy. Id. "Our focus

51

must be not on the timing of the conspiracy's operations, but on whether it functioned as an ongoing unit." Id. at 219.

Here, there was little to no evidence that Eccleston was involved in a separate conspiracy unrelated to that charged in the indictment. Rather, there was testimony that Eccleston was involved in a cocaine enterprise that centered around his co-defendant, Whitehurst. Several witnesses identified Eccleston as purchasing amounts of powder cocaine in excess of that typically obtained for personal use. Witnesses also placed Eccleston in at least two of the drug ring's stash houses during the sale of crack cocaine. Additionally, audio tapes of wiretapped phone calls detailing sales were played for the jury. This evidence points to a single conspiracy.

## B.

Eccleston additionally argues that mere presence or association is insufficient to support a charge of conspiracy. He contends that the evidence clearly shows that he was not part of the charged conspiracy, and that the jury instead found him guilty of conspiracy based solely on his presence in the stash houses or his association with others who were engaged in illegal activity.

In explaining why it rejected certain jury instructions, the district court noted that Eccleston "had a request for a separate instruction on association and presence which the Court

52

found was already contained in the conspiracy instructions." J.A. 995. We agree. The court instructed the jury that "the government must prove that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish an unlawful act." J.A. 1041 (Jury Instruction No. 47). The requirement that the government prove a mutual understanding sufficiently communicates that both Eccleston and any other person with whom he allegedly conspired understood that Eccleston was part of the conspiracy. The instructions given made clear that simple presence or association was insufficient for conviction.

We hold that the district court did not abuse its discretion in refusing the requested instructions.

## IX.

Finally, Eccleston challenges his sentence. The jury attributed to him less than 28 grams of crack cocaine, as well as between 500 grams and 5 kilograms of powder cocaine to him. Eccleston argues that the district court thus erred in attributing to him for sentencing purposes more than 28 grams of crack cocaine to him, and in attributing 16 kilograms of powder cocaine. "We review the sentence imposed by a district court under a 'deferential abuse-of-discretion standard.' We review factual findings for clear error, and legal conclusions de

53

novo." United States v. Davis, 679 F.3d 177, 182 (4th Cir. 2012) (citation omitted).

Contrary to Eccleston's contention, the district court attributed less than 28 grams of crack cocaine to him.[11] See J.A. 1078. The district court then concluded that the appropriate base offense level was 34.[12] Next, it raised the offense level to 36 due to an obstruction of justice

---

[11] Although Eccleston argued in the district court that no amount of crack cocaine should be attributable to him as relevant conduct, he does not explicitly advance that argument here. Even if he did, we would review the district court's determination of the drug quantity attributable to him only for clear error. United States v. Randall, 171 F.3d 195, 210 (4th Cir. 1999). For sentencing purposes, a defendant is accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," which "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG § 1B1.3(a)(1)(B); see also United States v. Williams, 986 F.2d 86, 90 (4th Cir. 1993) ("A defendant convicted of conspiracy should be sentenced not only on the basis of his conduct, but also on the basis of conduct of coconspirators in furtherance of the conspiracy that was known to the defendant or reasonably foreseeable to him."). Here, there is evidence in the record to support the district court's conclusion that it was foreseeable to Eccleston that crack cocaine would be sold as part of the conspiracy. Witness testimony established that he was present in the stash houses while his coconspirators sold crack cocaine. Indeed, Rainey's testimony established that the conspiracy sold crack cocaine at a rate of 3 ounces per day, or 2.25 kilograms per month, for 16 months. Given this witness testimony, we find that the district court did not clearly err in attributing less than 28 grams of crack cocaine to Eccleston.

[12] This base offense level incorporated both the powder and crack cocaine.

54

enhancement. Eccleston's trial counsel confirmed that the base offense level of 34 was correct. See J.A. 1076-78 (arguing that no crack cocaine at all should be attributed to Eccleston, but conceding that if less than 28 grams of crack cocaine were attributed him, the base offense level would be 34). We thus reject Eccleston's argument that the district court erred in attributing to him less than 28 grams of crack cocaine.

In arguing that the district court erred in attributing 16 kilograms of powder cocaine to him,[13] Eccleston relies primarily on Alleyne v. United States, 133 S. Ct. 2151 (2013), which expressly overruled the Supreme Court's decision in Harris v. United States, 536 U.S. 545 (2002). Alleyne, 133 S. Ct. at 2155. Specifically, the Court held "that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." Id. Here, however, the facts at issue -- the amount of powder cocaine attributable to Eccleston -- did not serve to increase a mandatory minimum, and thus Alleyne does

---

[13] As indicated above, the jury attributed only between 500 grams and 5 kilograms of powder cocaine to Eccleston. In attributing 16 kilograms to Eccleston for sentencing purposes, the district court accepted the government's analysis of Rainey's testimony. The government pointed to Rainey's testimony that the drug operation "moved about a kilogram a month" during the course of the 16 month conspiracy. J.A. 1066. Eccleston does not challenge these calculations except to say that the amount is "clearly in excess of the jury's finding." Opening Br. of Appellant 50.

not apply.  See United States v. Benn, 572 F. App'x 167, 180 (4th Cir. 2014) (unpublished) ("The district court's drug quantity determinations at sentencing did not increase Appellants' statutory mandatory minimum sentences, but rather, were used to determine their advisory Guidelines ranges (from which, in any event, the district court varied downward).")[14]  We thus reject Eccleston's argument that the district court erred in its attribution of powder cocaine during sentencing.

## X.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[14] The district court here also varied downward.